Joseph C. WAGNER et al., Appellants,

v.

AUSTIN SAVINGS AND LOAN ASSOCIATION, Appellee.

No. 7712.

Court of Civil Appeals of Texas, Beaumont.

June 19, 1975.

Rehearing Denied July 24, 1975.

John F. Morehead, William F. Turman, Donald F. Nobles, Austin, for appellants.

Coleman Gay, Austin, for appellee.

KEITH, Justice.

This is a usury suit. Harris-Wagner Corporation, a defunct Texas corporation, borrowed money from the defendant, Austin Savings and Loan Association. Plaintiff Wagner alleged that he owned one-third of the capital stock of the defunct corporation; Harris intervened, aligned himself with Wagner, and alleged that he owned the other two-thirds of the stock of the corporation. We will designate Wagner and Harris, collectively, as the plaintiffs. They sought to recover, as individuals, the penalties authorized by *Vernon's Tex.Rev.Civ. Stat.Ann. art.* 5069–1.06 (1971). After a trial to the court, judgment was entered for defendant and plaintiffs appeal.

There is little dispute in the facts and the trial court filed extensive findings of fact. After a careful review of the evidence, we are of the opinion that such findings have substantial support in the evidence and our statement of the case will be taken largely therefrom.

Plaintiffs' corporation applied to defendant for a line of credit to be used in the development of Castlewood Forest, Section One, a sudivision in Travis County owned by the corporation. It was contemplated that an initial loan of $50,000 would be required and that other loans would be made to the corporation in the development of the subdivision. This initial loan was made on October 1, 1968, as evidenced by a note due on or before three years after date which bore interest at 7¾% per annum payable semiannually.

The deed of trust securing such note covered thirty lots in the subdivision and provided that partial releases from the lien could be obtained by paying $2,500 for each lot so released, $2,000 of which would be credited to the face of the note and $500 charged as a release fee. The corporation was not obligated to secure the release of lien on any lot or to pay any release fee unless it so desired. Released fees of $500 each were paid on various dates between November 22, 1968, and August 13, 1969, and eighteen of the lots covered by the original deed of trust were released.

The defendant deducted two "points" or $1,000 from the face of the loan and this amount was never made available to plaintiffs' defunct corporation. A large part of the original loan was disbursed shortly after its execution and the balance as needed by the corporation. Interest was charged only after disbursements had been made. Defendant collected as interest: $785.68 on March 25, 1969; $213.27 on April 10, 1969; for a total amount of $998.95.

In establishing its line of credit for the development of the subdivision, the corporation assigned to defendant a refund contract which it was contemplated that the City of Austin would execute in favor of the corporation. This refund contract, as finally executed, provided that City would refund to the corporation 80% of the amount it expended in constructing the water system in the subdivision, plus interest at the rate of 3% per annum, payable over a period of not more than 25 years. Payments by City under the contemplated contract would be from a portion of the revenue it received from the operation of the water system through sale of water to residents of the subdivision. The utility

refund contract was not executed by City until August 21, 1969, nearly eleven months after its assignment to defendant; but there was testimony that the utilities so constructed by the corporation had been approved by City shortly after October 1, 1968.

There was testimony that after its execution by City, the utility refund contract had a cash value of about 50% [or approximately $12,000] of the amount that would be refunded eventually by City but a developer with a good credit rating could borrow up to about 60% of its value. The Court, however, concluded that: "[T]he testimony as to the cash value [of the utility refund contract] on October 1, 1968, of the certificate which was thereafter issued on August 21, 1969, is uncertain, and it would be impossible to assign a dollar value to it on the earlier date [October 1, 1968, the date of the $50,000 note]."

Defendant received from the City under the refund contract the amounts shown opposite the respective dates: March 30, 1971 —$723.05; March 6, 1972—$1,117.07; March 2, 1973—$1,163.09.

In addition to the original loan, defendant made nineteen other loans to the corporation. One of such loans, in the amount of $35,046.66, was secured by a second lien on the thirty lots covered by the first lien securing the first $50,000 loan; the other loans were secured by liens on single lots in the subdivision where the corporation was building residences for sale. The aggregate of such additional loans was in excess of $480,000.

The corporation defaulted upon the $50,-000 note when there was an unpaid balance of $11,523.29 on the loan and at a time when the second lien note of $35,046.66 was due and delinquent. Defendant bid in the property at the trustee's sale for the amounts due upon the two notes, leaving no deficiency balance on either. The trustee's sale took place on March 3, 1970. Suit was instituted on January 12, 1973.

■ At the outset of our discussion, it is well to note that the contract involved was not, on its face, one calling for usurious or unlawful interest. Thus, as said by Justice Johnson while upon the Court of Civil Appeals and speaking for the court in *Richards v. Moody*, 422 S.W.2d 200, 202 (Tex.Civ.App. —Houston [14th Dist.] 1967, writ ref'd n. r. e.):

"In such instance it is the plaintiff's obligation to establish that there was a corrupt agreement or scheme to cover usury and that such agreement or scheme was in full contemplation of the parties. *Slaughter Co. v. Eller*, Tex.Civ.App., 196 S.W. 704, err. ref."

■ And, we say, as did Justice Johnson in the case just cited, "In the case at bar, the record will not support the conclusion that there was a corrupt agreement or scheme that was, in fact, in contemplation of the parties." *Id.*

■ The trial court having filed findings of fact and conclusions of law, we invoke another rule of law of wide acceptance. It was articulated in *Rich v. Ferguson*, 45 Tex. 396, 399 (1876): "A jury being waived, and the cause submitted to the judge, his decision is entitled to all the presumptions in its favor that a verdict of the jury should have." The rule has continuing vitality. See, e. g., *Ligon v. Chas. P. Davis Hardware, Inc.*, 492 S.W.2d 374, 375, 376 (Tex. Civ.App.—Austin 1973, no writ):

"Findings of fact by the court are comparable to a jury verdict upon special issues, and when supported by some competent evidence those findings will not be disturbed on appeal. 4 McDonald, Texas Civil Practice, § 16.05 (Rev.Ed.1971)."

See also, *Jacobini v. Zimmerman*, 487 S.W.2d 249 (Tex.Civ.App.—Fort Worth 1972, no writ); *Kroger Company v. Warren*, 420 S.W.2d 218 (Tex.Civ.App.—Houston [1st Dist.] 1967, no writ).

As noted earlier, defendant charged the corporation a two percent premium for the

making of the loan ($1,000) and this sum was never made available to the corporation. The first conclusion of law filed by the trial court is quoted in the margin[1] and is attacked by plaintiffs' seventh point which is also quoted in the margin.[2]

The 1960 constitutional amendment to *Tex.Const. art. XVI, § 11, Vernon's Ann. St.*, was designed to permit the legislature greater flexibility in defining usury and in classifying lenders,[3] the pertinent portion thereof reading:

"The Legislature shall have authority to classify loans and lenders, license and regulate lenders, define interest and fix maximum rates of interest."

The legislature, pursuant to such constitutional authorization, has adopted several classifications applicable to this case. First, it has classified borrowers. Corporations may be charged legal interest not to exceed one and one-half percent per month. *Tex.Rev.Civ.Stat.Ann. art.* 1302–2.-09 (Supp.1974–1975), added by Acts 1967, 60th Leg., p. 713, ch. 296, § 1. But another Act, approved two days earlier, provided that individuals could not, except as otherwise provided by law, be charged a rate of interest in excess of ten percent per annum. *Tex.Rev.Civ.Stat.Ann. art.* 5069–1.02; Acts 1967, 60th Leg., p. 609, ch. 274, § 2. See also, *Sud v. Morris,* 492 S.W.2d 335, 337 (Tex.Civ.App.—Beaumont 1973, no writ).

The legislature also classified lenders and made special provision with reference to savings and loan associations which were regulated by the Texas Savings and Loan Act, *Tex.Rev.Civ.Stat.Ann. art.* 852a

(1964).[4] Such associations are authorized by § 5.07 thereof to charge premiums for the making of such loans which shall be in addition to interest authorized by law and shall not be deemed a part of the interest collected or agreed to be paid on such loans "within the meaning of any law of this State which limits the rate of interest which may be exacted in any transaction."

Plaintiffs make no constitutional challenge of this statute and the meaning thereof is clearly dispositive of the contention now advanced by plaintiffs.

The amendment to the constitution noted earlier, and the subsequent statute, render inoperative as authority the single case cited by plaintiffs, *Independent Lumber Co. v. Gulf State Bank,* 299 S.W. 939 (Tex.Civ. App.—Galveston 1927, writ ref'd). Plaintiffs, by post submission brief, call our attention to an article by P. Loiseaux, "Some Usury Problems in Commercial Lending," 49 *Tex.L.Rev.* 419, 422 (1971). The author predicts that "a court undoubtedly would label a payment for 'points' as interest within the broad definition." We do not use the broad definition; instead, using the constitutional grant of power to classify borrowers and lenders along with the statutory enactment as to savings and loan associations, we hold that such "points" are not interest within the usury statutes. Point seven is overruled.

Plaintiffs' first three points complain that it was error for the trial court to find that the release fees did not constitute interest but were analogous to prepayment penalties. It was contemplated by the par-

1. "Art. 852a, Sec. 5.07, provides that associations such as defendant in this cause '. . . may charge premiums for making such loans as well as penalties for prepayments or late payments; . . .' and under that provision defendant had the right to charge a premium of 2%, ($1,000.00) for making the loan."

2. "The trial court erred in concluding, if it concluded, that the 'points' were not interest."

3. See generally, R. Pearce and J. Williams, "Punitive Past to Current Convenience—A Study of the Texas Law of Usury," 22 *Sw. L.J.* 233, 235 (1968).

4. Other lenders, upon compliance with the applicable statutes, are permitted to charge rates of interest greatly in excess of ten percent per annum. See, e. g., "Regulated Loans," *Tex.Rev.Civ.Stat.Ann. art.* 5069, § 3.01 *et seq.,* and particularly §§ 3.15 and 3.16.

ties that the original loan would be used for the construction of the utilities, without which no lot could be sold. Thereafter, the borrower would begin the construction of a residence on one of the lots so that it could be sold. It sought, and procured, a partial release as to the particular lot; and, after selling the house, defendant financed the purchaser in his acquisition thereof, a process which was repeated on many occasions.

Having examined the record carefully, we find that the trial court's second finding of fact, quoted in the margin,[5] is supported by the evidence. This was followed by a conclusion of law reading:

"The provision for a payment of $2,500.00 in order to secure the release of a lot does not render the loan usurious, since a partial release was a privilege of the borrower, which it was not required to pay unless it wanted a partial release. The situation is analogous to a provision for a prepayment penalty which is contained in many notes or deeds of trust."

We have noted earlier the legislative authorization for savings and loan associations to charge "points." The same statute, *Tex. Rev.Civ.Stat.Ann. art.* 852a, § 5.07, also authorizes savings and loan associations to charge "penalties for prepayments." By the statute, these penalties are not interest under the usury laws. Thus, if such charges were levied for prepayment, plaintiffs' points are without merit.

■ *Tex.Rev.Civ.Stat.Ann. art.* 5069–1.01 (1971) defines interest as "the compensation allowed by law for the use or forebearance or detention of money." The privilege of paying a note in advance of maturity is not compensation for "use or forebearance or

detention of money." On the contrary, the prepayment so made is compensation for not being required to use or keep the money. It is an option available to the borrower.

In *Vela v. Shacklett,* 12 S.W.2d 1007, 1008 (Tex.Comm'n App., 1929), the Court said:

"The provision in the contract for the prepayment privilege is not a contract for the forbearance of an existing indebtedness or a loan of money. . . .

"The lender in this case had no right to require the payment of three months' advance interest. This was purely optional with the borrower. There being no right to demand payment, there was no forbearance, and, without forbearance, no usury."

See also, *Gulf Coast Investment Corporation v. Prichard,* 438 S.W.2d 658, 661 [Tex. Civ.App.—Dallas, writ ref'd n. r. e., 447 S.W.2d 676 (Tex.1969)], and cases therein cited.[6]

But, plaintiffs argue "that the *Vela* case and those that follow same [including *Prichard*] disregard a basic distinction under the Texas Usury Statutes." We disagree. As applied to this case, the language heretofore referred to in *Art.* 852a, § 5.07, removes the prepayment penalty from the reach of the usury statute. We will continue to follow the statute and the earlier decisions of our courts. The first three points of error are overruled.

Plaintiffs bring forward three points attacking the trial court's finding that the assignment of the utility contract should be allocated over all of the loans made by the defendant to the corporation rather than

---

5. Finding of Fact No. 2: ". . . The deed of trust covered 30 lots, and it provided that partial releases from the lien of the deed of trust could be secured by paying $2,500.00 to defendant, of which $2,000.00 would be credited upon the note and $500.00 would be charged as a release fee. There was, of course, no obligation on the corporation's part to secure the release of any lot or to

pay any release fee unless it desired to secure a release."

6. In refusing the writ with the notation "no reversible error," the Supreme Court in *Prichard* noted "that a correct result was reached by the Court of Civil Appeals." The prepayment question was the keystone to the opinion in the intermediate court.

concluding that the assignment was interest allocable only to the original note of $50,-000. The subsidiary points are that, in reaching this conclusion, the trial court improperly admitted parol evidence supporting his conclusion when the instrument was unambiguous on its face. Again, we note that the burden was on the plaintiffs to convince the trier of the facts that the value of the assignment was interest which made the transaction in question usurious.

In essence, the trial court found that the financing of a subdivision was a three-step process: the installation of the utilities, the construction of houses on the lots, and the sale of the houses and lots. Except for a single loan of $35,046.66, defendant made eighteen interim loans ranging from $20,-000 to $34,500 to finance houses in the subdivision.

Plaintiffs' defunct corporation, to succeed in its venture, had to have the utilities in place before it could sell the houses; and, only through the sale of the completed houses could it hope to make a profit. Indeed, plaintiffs do not even now contend that the additional loans were not in contemplation of the parties when the original loan of $50,000 was made, nor do they contend that the additional loans aggregating $480,000 were not made. Instead, their sole contention is that since these additional loans were not mentioned in the assignment, evidence introduced showing the true consideration was inadmissible as varying the terms of the written instrument.

■ We readily admit that the parol evidence rule has continuing validity; but, as was said by Judge Sharp in *McFarland v. Shaw,* 45 S.W.2d 193, 195 (Tex.Comm'n App., 1932, holdings approved): " 'Many of the exceptions to the parol evidence rule are quite as well settled as the general rule.' "

One of these rules is set out in *Pitts v. Camp County,* 120 Tex. 558, 39 S.W.2d 608, 614 (1931):

"Where the consideration, moving a grantor to execute a written conveyance of property, is not contractual in its nature, it is permitted to prove the real consideration, the doing of which does not infringe upon the rule that the terms of a valid written instrument cannot be varied by oral testimony. This is especially true, where the oral testimony does not contradict the written instrument, but rather shows what the real consideration is. *Lanier v. Foust,* 81 Tex. 186, 16 S.W. 994; *Taylor v. Merrill,* 64 Tex. 494, and authorities there cited."

The rule was stated in slightly different language by Justice Denton, while upon the Court of Civil Appeals, in *Rubin v. Adams,* 368 S.W.2d 42, 44 (Tex.Civ.App.—Amarillo 1963, writ ref'd n. r. e.):

"The general rule is that the recitals of a written instrument as to the consideration is not conclusive, and it is competent to inquire into the consideration and show by parol evidence the nature of the real consideration."

■ We say, as did Justice Denton in *Rubin:* "In the case at bar the parol evidence did not vary the terms of the written instrument." *Id.* Instead, such evidence simply showed the real consideration for the execution of the assignment.

■ Plaintiffs, always laboring under the burden of establishing usury, fail for still another reason in their attack upon the court's findings and conclusions with reference to the assignment of the utilities contract. Usury, under the controlling case law of this state, is not proved by showing that the lender is to receive something of doubtful value.

■ *Beavers v. Taylor,* 434 S.W.2d 230 (Tex.Civ.App.—Waco 1968, writ ref'd n. r. e.), discusses many of the cases on the subject and enunciates the rule prevailing in this state. There the borrowers agreed to pay the lender, in consideration of the loan

and of the services rendered by her, a percentage of the gross sales of Fully Formed Top Company. She rendered no personal services but the percentage payments to her under the contract amounted to about 20% annually on the note, all of which she dutifully reported on her income tax return as "interest." The Court denied the claim of usury, saying:

> "The contract here provided for payments of a percentage of gross sales of the Fully Formed Top Company. If Fully Formed Top Company had no gross sales, there would have been no payment. *A loan is not usurious where the promise to pay a sum depends upon a contingency.* Pansy Oil Co. v. Federal Oil Co., Tex.Civ. App., er. ref., 91 S.W.2d 453. *And a contract is not usurious where the lender is to receive uncertain value, as here, even though the probable value is greater than lawful interest.*" (434 S.W.2d at 231, emphasis supplied)

In *Pansy Oil Co. v. Federal Oil Co.,* 91 S.W.2d 453, 457 (Tex.Civ.App.—Texarkana 1936, writ ref'd) (cited in *Beavers, supra*), the court quoted from an out of state case, saying:

> " 'It is settled law that when the promise to pay a sum above legal interest depends upon a contingency, and not upon the happening of a certain event, the loan is not usurious.' "

Our record discloses that City was not obligated to pay anything under the contemplated utility agreement until several contingencies had occurred, the first of which was that the corporation would complete the installation of the utilities in accordance with the governing city ordinance. Next, the City would pay only portions of the sums received from the users of water by the occupants of the homes to be constructed upon the thirty lots in the subdivision, there being no water users in the subdivision at the time of the assignment. Moreover, even after construction of the homes, purchaser-occupiers of the homes must move in and consume the water. These were all contingencies, not certain events.

The trial court properly concluded that it was "impossible to assign a true dollar value to the contract thereafter to be issued, and the receipt by defendant of money from that source obviously was dependent on several circumstances [contingencies]."

After careful consideration of the entire record, we find no error and the judgment of the trial court is Affirmed.